J-S96014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.S.M., NATURAL FATHER | No. 859 WDA 2016 |

Appeal from the Order May 16, 2016
In the Court of Common Pleas of Washington County
Orphans' Court at No(s): 63-16-0236

BEFORE: BENDER, P.J.E., BOWES, J., and SOLANO, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 9, 2017**

J.S.M. (Father) appeals from the order entered on May 16, 2016, involuntarily terminating his parental rights to his daughter, A.M. (Child), born in May of 2013.[1] For the reasons that follow, we affirm.

On appeal, Father's brief provides the following questions for our review:

> I. Whether the trial court erred in terminating Father's parental rights where the Agency failed to prove by clear and convincing evidence that Father evidenced a settled purpose of relinquishing parental claims to the child and failed to prove that Father refused or failed to perform parental duties[?]
>
> II. Whether the trial court erred in terminating Natural Father's parental rights pursuant to Section 2511(b) when the record is devoid of any testimony as to the Father's bond with the minor child or as to what effect the severing of any bond would have on the minor child[?]

Father's brief at 4.

---

[1] A.S.C. (Mother) agreed to a voluntary termination of her parental rights and is not a party to this appeal.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 2 -

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 763.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion written pursuant to Pa.R.A.P. 1925(a) that was authored by the Honorable Katherine B. Emery of the Court of Common Pleas of Washington County, and filed on August 1, 2016. We conclude that Judge Emery's well-reasoned decision correctly addresses the issue raised by Father relating to Section 2511(a)(1), and rely on it for our review of Father's first issue.

However, for the reasons stated below, we address a limited portion of Judge Emery's decision with regard to Section 2511(b). In particular, we recognize that Judge Emery's opinion references the foster parents' willingness to have Father maintain a relationship with Child. Specifically, the trial court stated:

> While the [c]ourt recognizes that, with [] Father, there is no guarantee that foster parents will do so, they have already agreed to an Act 101 Agreement[2] with [] Mother and her

---

[2] An Act 101 Agreement is based upon the language contained in 23 Pa.C.S. § 2731, which provides:

**§ 2731.  Purpose of subchapter**

The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

(1)  is in the best interest of the child;

*(Footnote Continued Next Page)*

voluntary relinquishment was done with that contingency. There is no doubt with the [c]ourt that the foster parents will indeed maintain contact. They pursued the Christmas visit, not [] Father, and have been very supportive of both parents. The totality of the evidence established that no adverse effect will occur if the parental bond is legally severed as the status quo will continue and that there is only a minimal bond and the termination best meets the needs and welfare of [] [C]hild.

Trial Court Rule 1925(a) Opinion (TCO), 8/1/16, at 11 (citation to the N.T. omitted).

With reference to this portion of the trial court's decision, Father contends that the trial court "should not have considered the foster parents['] willingness to maintain contact between [] [F]ather and the minor [C]hild, as there is nothing enforceable about such an agreement. Such a consideration was an improper analysis of the totality of the circumstances in this case." Father's brief at 14 (emphasis added). To support this argument, Father relies on *In re Adoption of G.L.L.*, 124 A.2d 344, 348 (Pa. Super. 2015) (stating that "[o]pen adoption is a purely voluntary arrangement requiring the consent of the adoptive parents in order to enter into an agreement with birth relatives for ongoing communication or contact

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S. § 2731.

that is in the best interest of the child"); and **In re K.H.B.**, 107 A.2d 175, 184 (Pa. Super. 2014) (explaining that open adoption agreement is optional and not required by Section 2511; that the court erred in declining to grant petition for involuntary termination because of paternal aunt's refusal to enter into voluntary agreement; and the court improperly conflated analysis of termination of parental rights with adoption). Our review of these two cases reveals that neither are exactly on point with the facts as found in the instant matter.

Again, we conclude that in its opinion, the trial court sufficiently discussed the evidence presented, specifically recognizing that no "close, strong bond" exists between Father and Child and that the sole visit between Father and Child in the ten months prior to the termination hearing occurred at the behest of the foster parents. **See** TCO at 9-10. Therefore, we rely on the court's discussion in its opinion, relating to Section 2511(b), as the basis for concluding that the needs and welfare of Child would best be met by terminating Father's parental rights.

Separately, we note that the trial court's discussion quoted *supra*, relating to an Act 101 agreement, is superfluous at this point in the process as such an agreement for continuing contact "shall be filed with the court that finalizes the adoption of the child." 23 Pa.C.S. § 2735(a). Moreover, acceptance of such an agreement by the court does not occur until after a termination petition has been granted. Thus, we conclude that Father's

assertions with regard to the trial court's consideration of an after-termination contact agreement are of no moment. Sufficient support for the trial court's decision appears in the record and the court's discussion of that evidence addresses Father's claims of error. Therefore, we also rely on Judge Emery's opinion for our review of Father's second issue.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2017

596014-16

Copies: CYS, Daniel Chunko, Esq.; Tamora Reese, Esq.; Erick Rigby, Esq.; G. Clayton Nestler, Esq.

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

ORPHANS' COURT DIVISION

IN RE:

|  |  |  |
|---|---|---|
| ADOPTION OF: | ) | |
| | ) | |
| A.M., | ) | NO. 63-16-0236 |
| | ) | |
| MINOR CHILD | ) | |

## TRIAL OPINION PURSUANT TO PA. R.A.P. 1925(A)

This case came before the Court on a Petition for the Involuntary Termination of Parental Rights filed by Washington County Children and Youth Social Services Agency (CYS) on

*J.S.m.*

February 23, 2016. The petition sought to terminate the rights of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (hereinafter referred to as "Father") to A.M. A hearing was held on May 3, 2016. Father was present and represented by counsel; the child was represented by a Guardian ad Litem appointed by the Court. Upon consideration of the facts elicited in the termination hearing, the Court found that the Petitioner, CYS, proved by clear and convincing evidence that statutory grounds for the involuntary termination of the rights of the Father exist pursuant to 23 Pa. C.S.A. §2511(a)(1) and §2511(b) and terminated the Father's parental rights on May 16, 2016. This timely appeal ensued.

### I.  FACTS

*A, S, C,*

A.M. was born May ●, 2013 in Virginia. Her Mother is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (also

-1-

REC'D AUG – 1 2016

~Appendix "A"

~~known mother Custody (a line)~~), who voluntarily terminated her parental rights. (T.T. p. 14) At the time of the child's birth, the parents were living in Virginia. The Commonwealth of Virginia Child Protective Services received allegations on August 20, 2013 of drug use in the home and concern over the child's low weight. Allegations were again made to Virginia Protective Services on August 15, 2014 that the child was not being cared for properly and living in filthy conditions and the case was accepted for ongoing services. However, their case was closed in September of 2014 as the family moved to West Virginia, then to Pennsylvania. Virginia records indicated Father's involvement was minimal and that they urged him to be more involved with the child. (T.T. pp. 49-50) The Father was employed in the gas industry, working on various gas rigs. (T.T. p. 110-111)

Washington County CYS became involved with the family on February 7, 2015, when Mother was stopped for a traffic violation with the child in the car and heroin was found. (T.T. p. 47) The Mother admitted to being addicted to heroin. At the time of her arrest, Mother reached the Father by phone; he was unavailable to return home immediately as he was at a gas well rig in West Virginia. (TT. pp. 48, 83) The child was placed on that date in foster care where she has remained. (T.T. p. 19) At the time of placement the child was filthy and significantly underweight, being in the 10th percentile. (T.T. p. 20) The child was adjudicated dependent on March 2, 2015. (T.T. p. 19) Juvenile Court ordered the Father to have a drug and alcohol evaluation and follow any recommended treatment and to participate in a parenting education program and to provide names of any possible placement resources. Father was provided supervised visitation twice per week and daily telephone contact. (Exhibit 1, Dependency Order March 2, 2015) On June 1, 2015, the Father was ordered to also complete a

-2-

mental health evaluation and follow through with any treatment. (Exhibit 1, Order of June 1, 2015).

Father regularly visited with the child, although he was often late. (T.T. p. 32) Father acted appropriately during the visits. (T.T. p. 51) In March of 2015, the Father had an industrial accident and lost his small finger and a small part of his hand and has been unable to work and receives Worker's Compensation. (T.T. p. 94) The Father has a history of drug abuse. Father reported he had been addicted to pain pills but had been clean for four years. (Exhibit 2) After meeting his wife, he began using drugs again and ultimately began drug treatment with Suboxone. At the hearing on June 1, 2015, CYS drug tested Father. The drug tester discovered a bladder type device strapped to Father's inner thigh that contained urine; this device was intended to be used to avoid drug detection. Father admitted to trying to tamper with the drug test, and when he provided a valid sample, he was positive for Suboxone for which he had no prescription. (T.T. p. 21)

Father began parenting classes on June 1, 2015. He completed the first part of the program but was unsuccessfully discharged as he quit the program in August of 2015. (T.T. p. 43) On August 15, 2015, the Father separated from his wife and moved back to Virginia where he lives with his brother and his wife. (T.T. p. 82) He began drug and alcohol treatment in Virginia in August 2015 for opiate addiction. (Exhibit A) His treatment includes daily Suboxone and group and individual counseling; he has been compliant with treatment. (T.T. p. 40) The Father completed a mental health evaluation in January 2016. (T.T. p. 86) Dr. Steward diagnosed him with Adjustment Disorder with Anxiety and Substance Abuse. He recommended individual and family counseling, parenting and life skills classes and continued substance abuse

treatment. He opined that his prognosis was guarded and without remediation, poor. (Exhibit B)

The Father began seeing a psychiatrist in March of 2016; she prescribed medication but he has not yet begun to take them. (T.T. pp. 90, 91) He has not begun family personal counseling. (T.T. p. 92) Since moving to Virginia, the Father has seen the child one time; that visit occurred when the foster parents were in Virginia over Christmas and took the child to the Father's locale for a three hour visit. (T.T. p.p. 34, 62) The Father maintains phone contact with the child approximately five times a week. (T.T. p. 72)

## II. STANDARD OF REVIEW

In considering the petition, the Court utilized the standard of review that the moving party must present clear and convincing evidence of one of the grounds enumerated in the petition. In Re: J.D.W.M., 810 A.2d 688 (Pa. Super. 2002). The clear and convincing evidence standard means testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In the Matter of T.D., 949 A.2d 910, 915 (Pa. Super. 2008). The Court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. In Re: J.L.C., 837 A.2d 1247 (Pa. Super. 2003).

## III. RATIONALE

The Termination Petition alleged that Father's rights should be terminated pursuant to §2511(a)(1), (2), (5) and (8) of the Adoption Act enumerated as follows:

 (1) A parent, by conduct continued for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused

—4—

or failed to perform parental duties.

    (2)    The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for their physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parents.

    (5)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent is not likely to remedy the condition which led to the removal or placement of the child within a reasonable period of time, and termination of parental rights would best serve the welfare of the child.

    (8)    The child has been removed from the care of the parent by the court or under voluntary agreement with an agency twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist, the termination of parental rights would best serve the needs and welfare of the child.

23 Pa. C.S.A. §2511

To satisfy the requirements pursuant to 23 Pa. C.S. §2511(a)(1), CYS must establish by clear and convincing evidence that for the six months prior to filing the petition, the Father failed to perform his parental duties or evidenced a settled purpose of relinquishing his parental claims. Although it is the six month period immediately preceding the filing of the petition that is most critical to the analysis, the Court must also consider the whole history of the case and not mechanically apply the six month statutory provision. In Re: B.N.M., 856 A.2d 847 (Pa. Super. 2004), citing In Re: D.J.S., 737 A.2d 283 (Pa. Super. 1999)

-5-

"Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child...parental obligation is a positive duty which requires affirmative performance...parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." In Re: Burns, 474 Pa. 615, 379 A.2d 535, 540 (1977). The child has been out of the Father's care for over one year. The Father is not performing any day to day parenting duties. While the child was placed in foster care in Pennsylvania, the Father moved to Virginia. He visited the child only one time in the six months prior to the filing of the petition and none since the filing of the petition. Father claims he did not have a car and could not arrange transportation to Washington County. (T.T. pp. 106, 107) However, the Father had the financial means to arrange transportation; he receives over $3,000 a month in Worker's Compensation. (T.T. p. 115) He had resources to take a bus or to pay a friend or relative to drive him here on a regular basis. His move to Virginia was tantamount to abandonment. While the Father engaged in phone conversation with child, she cannot carry·on a meaningful conversation due to her age of two years old. The foster mother reports that the child generally does not talk to him but rather just listens, even though she does talk with other relatives on the phone. (T.T. p. 79) The Court finds that the Father has not exerted himself to take and maintain a place of importance in this young child's life. The Court finds that for the six month period prior to the filing of the termination of parental rights, the Father has failed to perform parental duties and has evidenced a settled purpose of relinquishing his parental rights, and CYS established, by clear and convincing evidence, that the Father's rights should be terminated pursuant to §2511(a)(1).

-6-

The Court found that CYS did not establish by clear and convincing evidence the elements of §2511(a)(2), (5) and (8). The Father has been attempting to remedy the conditions that led to the removal of the child and those sections would not apply to this case.

CYS also proved that termination best serves the developmental, physical and emotional needs and welfare of the child. 23 Pa. C.S. §2511(b). The Court found that a bond existed between the Father and child but it was not a strong one. Importantly, the termination would not sever the bond. The foster parents indicated that regardless of the outcome of the termination petition, they would continue to allow the Father to have contact with the child. The foster parents visit Virginia several times a year and stated they would continue contact with the Father regardless of the outcome of the hearing. (T.T. pp. 68, 77) The foster family has fostered 35 children and strongly feels that a child cannot have too many people love her. (T.T. pp. 74, 77) The Guardian ad Litem for the child strongly supported the termination and opined that a termination was in her best interest. (T.T. p. 121)

## IV. ISSUES ON APPEAL

A. The trial court erred in terminating Father's parental rights where the Agency failed to prove by clear and convincing evidence that Father evidenced a settled purpose of relinquishing parental claims to the child and failed to prove that Father refused or failed to perform parental duties.

The evidence is overwhelming that the Father has both failed to perform parental duties and evidenced a settled purpose of relinquishing his parental rights. At the time of the hearing, the child had been in placement for fifteen (15) months. In the six months prior to the filing of the petition, the Father visited the child only one time – at a visit suggested and arranged by the foster parents. During that period, the Father attended two review hearings on August 31, 2015

–7–

and November 30, 2015, but did not arrange for a visit with the child. Father has the time and financial resources to make regular visits with the child, but has chosen not to do so; rather, his contact is limited to phone calls with the child. The child is only two years old and lacks the ability to engage in any meaningful conversation. The Father moved to Virginia because he "figured out the truth about...his wife." (T.T. p. 93) His child's needs were ignored. The Father has not performed any parental functions in the six months prior to the filing of the petition. While he provided Christmas and birthday presents, he provided no financial support, gifts at other holidays, never provided a meal, clothing, guidance or nurturing. His move out of state while his small child remained in foster care in Pennsylvania was tantamount to abandonment and evidenced a settled purpose to relinquish his rights. Especially when his child is in foster care, the Father has a duty to work towards the return of the child by cooperating with CYS to obtain the services necessary for him to become capable of performing his parental duties and responsibilities. In Re: G-P-R, 851 A.2d 967 (Pa. Super. 2004) The Father has not worked with requisite speed to complete the services asked of him. The Father waited eleven months after the child's placement to obtain a psychological evaluation. He waited six months to begin a drug and alcohol treatment program. While he began a parenting program in June of 2015, four months after the child's placement, he did not complete the program because he moved. He signed up for a parenting program in Virginia, but it had not yet started as of the date of the hearing. (T.T. p. 92) The Father never contacted CYS to keep the caseworker up to date as to his services or progress. (T.T. pp. 24, 117) Keeping in contact with the caseworker is a critical component of having a child returned to a parent's care. The Father never even requested that the child be placed with him. Father has clearly not performed his parental duties and has

-8-

evidenced a settled purpose of relinquishing his parental claim and has offered no reasonable explanation for his failures.

> B. The trial court erred in terminating Natural Father's parental rights pursuant to Section 2511(b) when the record is devoid of any testimony as to the Father's bond with the minor child or as to what effect the severing of any bond would have on the minor child.

CYS must establish, by clear and convincing evidence, that termination of the Father's rights best meets the needs and welfare of the child. 23 Pa. C.S.A. §2511(b). The Court must examine the nature and strength of the parent-child bond and the effect of the severance of that bond. In Re: C.M.S., 884 A.2d 1284 (Pa. Super. 2005) The testimony from the foster mother, the Father and logical inferences from the facts in the case led the Court to its conclusion that CYS met its burden.

The evidence shows that, while there is no doubt that Father loves his child, the Father and child never had a close, strong bond. When the family was together, before the child's placement, the Father has never been actively involved in her daily life and routine. Father worked a lot and was away from home for extended periods as he was busy working in the gas industry. When questioned about how much time he spent with his child, Father stated, "I've lived in my home but worked out of state." (T.T. p. 111) The Virginia authorities found his involvement with the child to be "minimal" and encouraged him to become more active in her life. (T.T. p. 50) His response to that was to move to West Virginia, then Pennsylvania, so he could continue to work in the gas industry.

Father never described any activities that he did with the child or any special routines. When asked to describe his relationship with his child, he responded simply, "Good." (T.T. p.

−9−

96) He responded to the Guardian ad Litem's questions that he was away a lot. (T.T. p. 111) The Court logically concluded that the Father and child, at the time of the child's placement, when the child was not yet two years old, did not have a close, strong bond but did have a normal but distant relationship as Father and child.

After the child's placement, the Father maintained that relationship for approximately six months, with the Father visiting twice a week for up to two hours per visit. The Father never requested additional time with the child. (Exhibit 1) The Father then abruptly moved, not even informing the caseworker of his intentions. He has only seen that child one time, for a few hours in a McDonald's, in the ten months prior to the termination hearing. The Father has relied on maintaining a relationship with his child through telephone calls. Due to the child's tender years, the Court finds that to be not practical or possible. The foster mother's testimony was credible. While she clearly loves the child and is desirous of adopting her, she has a positive relationship with the Father and wants to maintain contact with him. She is exceptionally experienced fostering over 35 children. (T.T. p. 74) She testified that the child recognizes the Father's voice but doesn't engage in conversation with the Father but merely listens. (T.T. p. 79) She talks with other family members on the phone much differently and in a more engaging manner. (T.T. p. 79) The child never asks about her Father (T.T. p. 78) and is not sad or upset when the phone call ends or if he does not call. (T.T. p. 78) Those facts lead to the logical inference that any bond between the Father and child is minimal. Any severance of a minimal bond would not cause any adverse effect on a slightly less than three year old child. The child has a strong attachment with her foster parents and looks to them for all her care and parental guidance. (T.T. p.p. 35, 66)

-10-

The fact that the foster parents are willing to maintain a relationship with the Father is relevant as well. Their willingness will maintain the status quo. While the Court recognizes that, with the Father, there is no guarantee that foster parents will do so, they have already agreed to an Act 101 Agreement with the Mother and her voluntary relinquishment was done with that contingency. (T.T. p. 13) There is no doubt with the Court that the foster parents will indeed maintain contact. They pursued the Christmas visit, not the Father, and have been very supportive of both parents. The totality of the evidence established that no adverse effect will occur if the parental bond is legally severed as the status quo will continue and that there is only a minimal bond and the termination best meets the needs and welfare of the child.

## V. CONCLUSION

The Court's Order of May 16, 2016 should be affirmed.

BY THE COURT:

_____, J.
KATHERINE B. EMERY, JUDGE

-11-